No. 24-1822

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

BELIA ARLENE OCASIO; EFRAÍN COLÓN-DAMIANI,

*Plaintiffs-Appellees*,

*v.*

COMISIÓN ESTATAL DE ELECCIONES; JESSIKA PADILLA, in her official capacity as Acting President of the Comisión Estatal de Elecciones,

*Defendants-Appellants.*

On Appeal from The United States District Court for the District of Puerto Rico in Case No. 3:20-cv-01432, Judge Pedro A. Delgado-Hernández

## BRIEF FOR PLAINTIFFS-APPELLEES BELIA ARLENE OCASIO AND EFRAÍN COLÓN-DAMIANI

FERMÍN L. ARRAIZA-NAVAS
AMERICAN CIVIL LIBERTIES
   UNION OF PUERTO RICO
Union Plaza, Suite 1105
416 Avenida Ponce de León
San Juan, PR  00918
(787) 966-313


ADRIEL I. CEPEDA DERIEUX
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
915 15th St. NW
Washington, DC  20005
(787) 565-0189

GEORGE W. SHUSTER, JR.
RYANNE E. PERIO
THOMAS B. DAVIS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
george.shuster@wilmerhale.com
ryanne.perio@wilmerhale.com
thomas.davis@wilmerhale.com

*Counsel for Plaintiffs-Appellees*

February 26, 2025       *ADDITIONAL COUNSEL LISTED ON INSIDE COVER*

VICTORIA OCHOA
THERESA J. LEE
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 17th Floor
New York, NY  10004
(212) 549-2500

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees, Belia Arlene Ocasio and Efraín Colón-Damiani, are not required to file a Corporate Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1 because none of them is a non-governmental corporate party.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ................................................................. iv

PRELIMINARY STATEMENT ..............................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .................................4

STATEMENT OF THE CASE AND PROCEDURAL
      BACKGROUND ................................................................5

    A.    Voting In Puerto Rico During The COVID-19 Pandemic ...................5

    B.    Plaintiffs' Successful Lawsuit Guarantees Safe Voting
           For Themselves And Similarly Situated Seniors. ................................8

    C.    Plaintiffs' Fee Motion And The District Court's Fee
           Award ............................................................13

    D.    Defendants' Rearguard-Action Effort To Invoke
           PROMESA ......................................................14

STANDARD FOR REVIEW ..............................................................17

SUMMARY OF ARGUMENT .............................................................17

ARGUMENT .............................................................................20

I.    DEFENDANTS WAIVED ARGUMENTS RELATED TO THE
    DISCHARGE INJUNCTION BY NOT RAISING THEM DESPITE
    MULTIPLE OPPORTUNITIES ................................................20

    A.    Defendants Waived The Discharge Injunction Argument
           By Failing To Raise It Prior To The Fee Award.................................20

    B.    Defendants Further Waived The Discharge Injunction
           Argument By Failing To Raise It In Their
           Reconsideration Motion. ....................................................22

C.      Defendants Waived The Discharge Injunction Argument By Failing To Fully Develop It Below. ...............................................23

II.    THE FEE AWARD IS UNAFFECTED BY THE DISCHARGE INJUNCTION ENTERED IN THE TITLE III PROCEEDINGS ...................................27

    A.      The Discharge Injunction Does Not Bar The Fee Award Because The Fee Award Did Not Arise Until After The Effective Date Of The Plan. ................................................27

    B.      The Discharge Injunction Does Not Bar The Fee Award Because The Fee Claim Is A Non-Dischargeable Claim Under PROMESA. ...............................................32

    C.      Defendants Were Not Given Direct Notice Of The Title III Proceedings. ...................................................35

          1.    As Known Creditors, Plaintiffs Were Entitled to Direct Notice of the Title III Proceedings. ...............................35

          2.    Publication Notice is Insufficient as to Known Creditors ...................................................41

III.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ENTERING AND DECLINING TO RECONSIDER THE FEE AWARD ......................42

    A.      Plaintiffs Achieved Broad Success In The Underlying Litigation, And The District Court Made Adjustments As It Deemed Appropriate ........................................44

    B.      The District Court Appropriately Considered The Staffing Needed To Litigate Novel Issues During The Rapidly-Evolving COVID-19 Pandemic. ...........................................48

    C.      Attorney Mayte Bayolo's Fees Were Appropriate. ............................50

CONCLUSION ...................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**CASES**

Page(s)

*Andrade v. Jamestown Housing Authority,*
  82 F.3d 1179 (1st Cir. 1996).............................................................51

*Aybar v. Crispin-Reyes,*
  118 F.3d 10 (1st Cir. 1997)..........................................................22, 50

*Bartlett v. Mutual Pharmaceutical Co.,*
  759 F. Supp. 2d 171 (D.N.H. 2010)..................................................21

*Burke v. Guiney,*
  700 F.2d 767 (1st Cir. 1983).............................................................30

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991)............................................................................28

*City of Miami Fire Fighters' & Police Officers' Retirement Trust v.
  CVS Health Corp.,*
  46 F.4th 22 (1st Cir. 2022)................................................................43

*CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,*
  97 F.3d 1504 (1st Cir. 1996).............................................................26

*Cochran v. Quest Software, Inc.,*
  328 F.3d 1 (1st Cir. 2003)........................................................... 22-23

*Common Cause Rhode Island v. Gorbea,*
  970 F.3d 11 (1st Cir. 2020)...............................................................49

*Correa v. Hospital San Francisco,*
  69 F.3d 1184 (1st Cir. 1995).............................................................26

*Daniel R. L. v. Saul,*
  No. 1:20-CV-00258-DBH, 2021 WL 2801954 (D. Me. July 5,
  2021), *report and recommendation adopted sub nom. Daniel R. L.
  v. Kijakazi*, No. 1:20-CV-258-DBH, 2021 WL 3115820 (D. Me.
  July 22, 2021)....................................................................................25

*De Jesús Nazario v. Morris Rodríguez,*
    554 F.3d 196 (1st Cir. 2009) ................................................................. 30

*DiMarco-Zappa v. Cabanillas,*
    238 F.3d 25 (1st Cir. 2001) ................................................................... 21

*Empresas Stewart Cementerios v. Central General de Trabajadores,*
    No. CV 22-01320, 2023 WL 6631954 (D.P.R. Oct. 12, 2023) .......................... 22

*Federal Deposit Insurance Corporation v. World University Inc.,*
    978 F.2d 10 (1st Cir. 1992) ................................................................... 50

*Fox v. Vice,*
    563 U.S. 826 (2011) ........................................................................... 34

*Gay Officers Action League v. Puerto Rico,*
    247 F.3d 288 (1st Cir. 2001) ........................................................ 43, 48, 50

*Grendel's Den, Inc. v. Larkin,*
    749 F.2d 945 (1st Cir. 1984) ................................................................. 43

*Hafer v. Melo,*
    502 U.S. 21 (1991) ............................................................................. 35

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ........................................................................... 29

*In re Arch Wireless, Inc.,*
    534 F.3d 76 (1st Cir. 2008) ............................. 36, 37, 38, 39, 41, 42

*In re Bernier,*
    No. 17-03544 (ESL), 2024 WL 1608580 (Bankr. D.P.R. Apr. 12, 2024) ......... 41

*In re Cano,*
    410 B.R. 506 (Bankr. S.D. Tex. 2009) .................................................. 30

*In re Continental Airlines,*
    125 F.3d 120 (3d Cir.1997) ................................................................. 28

*In re Crystal Oil Co.,*
    158 F.3d 291 (5th Cir. 1998) ............................................................... 37

*In re Financial Oversight & Management Board for Puerto Rico*,
   650 B.R. 296 (D.P.R. 2022)................................................................32

*In re Financial Oversight & Management Board for Puerto Rico*,
   650 B.R. 286 (D.P.R. 2022)................................................................31

*In re Financial Oversight & Management Board for Puerto Rico*,
   578 F. Supp. 3d 267 (D.P.R. 2021), *aff'd*, 54 F.4th 42 (1st Cir. 2022)..............32

*In re Rojas*,
   No. 07-70058, 2009 WL 2496807 (Bankr. S.D. Tex. Aug. 12, 2009)..............30

*Kaplan v. First Hartford Corp.*,
   716 F. Supp. 2d 11 (D. Me. 2010) ......................................................23

*Lackey v. Stinnie*,
   No. 23-621, 604 U.S. ___ slip op. (Feb. 25, 2025) ................................29

*Lubricantes Venoco, International, C.A. v. M/V NEVERIS*,
   60 F. App'x 835 (1st Cir. 2003) ........................................................50

*Luis v. United States*,
   578 U.S. 5 (2016)............................................................................51

*McCoy v. Massachusetts Institute of Technology*,
   950 F.2d 13 (1st Cir. 1991)..........................................................26, 40

*Mennonite Board of Missions v. Adams*,
   462 U.S. 791 (1983)........................................................................37

*Monson v. City of Detroit*,
   No. 18-10638, 2019 WL 1057306 (E.D. Mich. Mar. 6, 2019)..........................41

*Municipality of San Juan v. Puerto Rico*,
   919 F.3d 565 (1st Cir. 2019)........................................................32, 33

*New York Gaslight Club, Inc. v. Carey*,
   447 U.S. 54 (1980)..........................................................................29

*New York v. New York, New Haven & Hartford Railroad Co.*,
   344 U.S. 293 (1953)....................................................................38, 39

*Ortiz v. Hernandez Colon,*
 511 F.2d 1080 (1st Cir. 1975)..............................................................35

*Osuji v. Departamento de la Familia,*
 No. CV 20-1545 (RAM), 2023 WL 2753683 (D.P.R. Apr. 3,
 2023), *opinion vacated on reconsideration sub nom. Aaduka Osuji*
 *v. Departamento De La Familia*, No. CV 20-1545 (RAM), 2023
 WL 6216352 (D.P.R. Sept. 25, 2023)..................................................31

*Palmer v. Champion Mortgage,*
 465 F.3d 24 (1st Cir. 2006).................................................................17

*Paterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,*
 840 F.2d 985 (1st Cir. 1988)..........................................................26, 40

*Pierluisi-Urrutia v. Comisión Estatal de Elecciones,*
 204 D.P.R. 841, 104 P.R. Offic. Trans. 18, 2020 WL 5044034
 (Aug. 12, 2020) .....................................................................................8

*Rederford v. U.S. Airways, Inc.,*
 589 F.3d 30 (1st Cir. 2009).................................................................28

*Rodriguez v. Municipality of San Juan,*
 659 F.3d 168 (1st Cir. 2011)..........................................................24, 25

*Rodríguez-Hernández v. Miranda-Vélez,*
 132 F.3d 848 (1st Cir. 1998)...............................................................48

*Rodríguez-Vélez v. Pierluisi-Urrutia,*
 No. CV 21-1366 (PAD), 2021 WL 5072017 (D.P.R. Nov. 1, 2021) ...................6

*Sindi v. El-Moslimany,*
 896 F.3d 1 (1st Cir. 2018)...................................................................25

*Tulsa Professional Collection Services, Inc. v. Pope,*
 485 U.S. 478 (1988)............................................................................37

*United States v. Crocco,*
 15 F.4th 20 (1st Cir. 2021)..................................................................23

*United States v. Mayendía-Blanco,*
 905 F.3d 26 (1st Cir. 2018).................................................................23

*United States v. Rivera-Rodríguez*,
    75 F.4th 1 (1st Cir. 2023) ...................................................................... 23

*United States v. Sevilla-Oyola*,
    770 F.3d 1 (1st Cir. 2014) ..................................................................... 25

*Vélez-Molina v. Rivera Schatz*,
    No. CV 20-1565 (MEL), 2023 WL 6536235 (D.P.R. Sept. 29, 2023) ............. 31

*Venegas-Hernandez v. Sonolux Records*,
    370 F.3d 183 (1st Cir. 2004) .................................................................. 50

*Villalobos-Santana v. Puerto Rico Police Bureau*,
    No. CV 21-1312 (ADC), 2024 WL 3152641 (D.P.R. June 5, 2024) ................ 31

*Wilson v. Garcia*,
    471 U.S. 261 (1985) .............................................................................. 34

## DOCKETED CASES

*In re Financial Oversight & Management Board for Puerto Rico*,
    No. 17-BK-3283-LTS (D.P.R.) ...................................... 14, 15, 36, 41

*Ortiz-Resto v. Rios-Matienzo*,
    No. 21-1232 (1st Cir.) ........................................................................ 31

## STATUTES AND RULES

11 U.S.C.
    § 362(a)(1) ........................................................................................ 27
    § 362(b)(4) ........................................................................................ 32
    § 944(c) ............................................................................................ 41

42 U.S.C.
    § 1981 .............................................................................................. 33
    § 1983 ............................................................. 3, 19, 27, 28, 34, 35
    § 1988 ............................... 3, 13, 19, 28, 29, 30, 33, 34, 35, 43
    § 2164 ...................................................................... 32, 33, 35
    § 2170 ...................................................................... 36, 42

Fed. R. Bankr. P.
    Rule 2002(a)(7)..................................................................................36, 42
    Rule 2002(b)(2)...........................................................................................36
    Rule 2002(c)(3)............................................................................................36
    Rule 2002(f)................................................................................36, 42
    Rule 2002(f)(1)(H)......................................................................................36
    Rule 3017(d) ...........................................................................................36, 42

Fed. R. Civ. P. 59(e).................................................................................15, 50

## LEGISLATIVE MATERIAL

S. Rep. No. 94-1011, *reprinted at* 1976 U.S.C.C.A.N. 5908 ......................29, 30, 34

## PRELIMINARY STATEMENT

Plaintiffs' underlying lawsuit was a quickly resolved but vitally important constitutional challenge to ensure they had a safe way to vote in the November 2020 election without risking their health at the height of the COVID-19 pandemic. Defendants unduly hindered these efforts at every turn, not least, by failing to appear on schedule and ignoring court-ordered deadlines. Plaintiffs ultimately succeeded: The District Court permanently enjoined Defendants to extend early and mail-in voting to voters—like them—over 60 years of age, prolong the deadline for eligible voters to apply to vote early, and launch a media orientation campaign to inform seniors of their rights and the modified deadline. Although Plaintiffs' claims focused on nonmonetary relief, the District Court awarded Plaintiffs $64,415 in statutory attorneys' fees for their successful efforts as civil-rights plaintiffs.

Defendants litigated the fees request the same way they did the underlying claims—at times, laxly, at others, obstinately. They raised myriad arguments, challenging everything from the request's timeliness, to Plaintiffs' staffing choices and time-entry documentation, to the credentials of Plaintiffs' counsel. None worked. The District Court carefully reviewed Plaintiffs' application, supporting time records, and Defendants' objections and issued a detailed order finding that the fees requested were reasonable given the "fluid factual and legal landscape" and "specialized legal questions" the pandemic raised and the pressure to resolve those

in time for the November 2020 election.  And it specifically found that many of the challenged time entries "came as a direct result of defendants' failure to [] respond" to deadlines "in a timely manner."  Defendants raised the same arguments a second time in a reconsideration motion, and the District Court again rejected them.  At no point in this sequence did Defendants raise any bankruptcy argument or defense.

But having been twice rebuffed on their lodestar arguments, Defendants sent up a final prayer: PROMESA.  Until May 2024, when Defendants filed a "Notice of Injunction" after briefing closed on their reconsideration motion, the Commonwealth's bankruptcy had not featured in these proceedings in any way. Defendants litigated the merits case without reference to Puerto Rico's bankruptcy save for a few words of reservation in their Answer.  They litigated both the fee and reconsideration motions without mentioning the bankruptcy or invoking the discharge and release of claims in the Commonwealth's confirmed adjustment plan. Indeed, over two years passed between when the bankruptcy plan became effective, marking the end of bankruptcy, and when Defendants "notified" the District Court that "this case is stayed and th[e] Court lacks jurisdiction."  In that time, Defendants briefed their reconsideration motion and complained of lodestar deficiencies.

One explanation for the later-than-eleventh-hour bankruptcy argument would be that Defendants just forgot to make it.  But that would be odd, considering how strenuously they now argue that the bankruptcy proceedings were known to all and

should have been known to Plaintiffs. Another explanation is that they figured, correctly, that the discharge injunction didn't apply to Plaintiffs' fees claim and thus invoked this meritless argument only after extinguishing all other options. Regardless of the explanation—and Defendants don't offer one—Defendants waived the argument that the discharge injunction bars Plaintiffs' claim for attorneys' fees by not making it in the many opportunities they had to do so below.

But even if Defendants had raised this argument in a timely fashion, it would have failed. The reorganization plan's discharge and release does not absolve the Commonwealth of all past and future obligations. Rather, they apply only to claims against the Commonwealth that arose prior to the plan's effective date. Instead, Plaintiffs' fees claim arose when the District Court, in its discretion, granted statutory fees, years after the plan became effective.

Nor is the bankruptcy plan a free pass for all kinds of obligations. Even if Plaintiffs' claim arose before the effective date, PROMESA specifically exempts from discharge obligations arising under federal laws governing public health or safety, like Plaintiffs' Section 1983 and 1988 claims here, and requirements under judicial orders to pay associated administrative, civil, or other penalties, like the District Court's fee award. As such, neither the timing nor the nature of the fee award fits within the bankruptcy plan's scope. Yet even if the plan did apply to the award, and even if Plaintiffs' claim were a non-exempted, pre-effective date claim,

the plan still wouldn't absolve the Commonwealth from liability. Plaintiffs were known creditors entitled to actual notice of the bankruptcy proceedings, the plan, and the discharge injunction, which Defendants did not provide. Without such notice, Plaintiffs' claim is not barred.

Finally, Defendants again quibble over time entries and billing rates for the third time, asking this Court to revisit the lodestar arguments the District Court twice considered and rejected. They raise not a single factual or legal error that would warrant such consideration, let alone the abuse of discretion and manifest error of law necessary to overturn the District Court's decision.

Defendants' conduct in this case, including and particularly relating to its litigation of Plaintiffs' attorneys' fees claim, has been neglectful at best, calculating at worst. But as this Court has said many times, it is not the Court's job to rescue a party from its own procedural failures, nor can a party ambush its opponent and the Court by first raising an argument after it has exhausted all others. The Court need not determine which scenario applies here to deny Defendants' appeal, and Plaintiffs respectfully request that it do so.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether Defendants waived arguments relating to the Discharge Injunction by not timely raising them prior to entry of the Fee Award or in their Reconsideration Motion from which this appeal has been ultimately taken.

2. Whether the Discharge Injunction in the Confirmation Order giving effect to the Commonwealth's Plan of Adjustment in its Title III Proceedings applies to the Fee Award in the first instance, and even if it does, whether the Fee Award is otherwise exempt from the Discharge Injunction.

3. Whether the District Court abused its discretion by awarding, and declining to reconsider, the amount of fees awarded to Plaintiffs.

## STATEMENT OF THE CASE AND PROCEDURAL BACKGROUND

### A. Voting In Puerto Rico During The COVID-19 Pandemic

In the run-up to the November 2020 elections, Plaintiffs Belia Arlene Ocasio and Efraín Colón-Damiani were Puerto Rico voters in their late 60s who suffered from chronic illnesses and faced an impossible choice between protecting their health and exercising their right to vote. Because of Puerto Rico's restrictive *voto adelantado* ("early voting") and *voto ausente* ("absentee voting") policies, there was no mechanism by which seniors and those with underlying health conditions could vote in the general election without violating social distancing protocols or other Centers for Disease Control recommendations. Their only alternative—to stay home—would leave them disenfranchised.

Puerto Rico voters like Ms. Ocasio and Mr. Colón-Damiani faced uniquely dire circumstances. While the Commonwealth's notedly aggressive efforts to curb the COVID-19 pandemic through strict 24-hour, 7 days-a-week lockdowns initially

slowed the virus's spread, A10-11, phased reopening and reduced lockdown requirements coincided in a surge of new cases in the late spring and through the summer, A12-13.

In response, on August 19, 2020, Puerto Rico's Governor announced strict restrictions, including a full 24-hour lockdown on Sundays except for certain essential purposes, the suspension of public transportation, and fines for violations of mask mandates. A13. But as the District Court recognized in another action, the "measures put in place during the crisis, including lockdowns, curfews, quarantines, closing of businesses and schools, gathering limits, prohibiting restaurants and bars from offering dine-in service, use of masks, and requiring facilities to screen staff and visitors for temperature … were not effective to prevent [an] increase in cases, hospitalizations and deaths." *Rodríguez-Vélez v. Pierluisi-Urrutia*, No. CV 21-1366 (PAD), 2021 WL 5072017, at *29 (D.P.R. Nov. 1, 2021). As of mid-August 2020, Puerto Rico ranked fourth in the United States for growth of cases per capita. A9.

Despite these grave pandemic-related conditions leading up to the 2020 general election, voting requirements remained stringent. Before the pandemic, the only exceptions to Election Day in-person voting under the Election Code were early voting for a small and select group of individuals, such as those confined to treatment centers or incarcerated, and mail-in ballots for certain Puerto Rico citizens living outside Puerto Rico. A15.

On June 4, 2020, Puerto Rico's Legislative Assembly took modest-but-welcome action.  It issued a Joint Resolution postponing primary elections from June to August and expanding eligibility for early voting for the primaries to include voters over 60 and voters with certain chronic health conditions, among other categories.  A16.  On June 20, 2020, the Governor signed Election Code 2020 into law, which marginally expanded the categories of individuals permitted to vote early for the general election.  A16-17.  Election Code 2020 did not permit all senior citizens to vote early, and neither the Joint Resolution nor Election Code 2020 permitted expanded voting by mail-in ballot.  A16-17.

But, as Defendants acknowledge, the Elections Commission poorly administered voting during the August 2020 primaries.  Defendants' Answer below admits that late delivery of ballots to polling sites resulted in long and crowded lines filled with voters from the same at-risk communities that early voting tried to safeguard.  A19-21.  To address undisputed instances of disenfranchised voters, those who couldn't successfully vote during the early-voting period were allowed to return to vote in-person on the day of the primary by using a "fast lane."  A20.  However, this accommodation put many voters in a catch-22.  Implemented to ensure that citizens could exercise their right to vote, it still jeopardized the health and safety of at-risk voters who had to attend polling locations *twice*, exposing themselves in close contact with even larger crowds at the primaries, further

increasing their risk of infection. A20. Defendants concede that voters who voted at polling stations for the August 9 primary waited in crowded lines for hours, resulting in delays so severe that many precincts closed their polling stations early. A21.

Per the Chief Justice of the Puerto Rico Supreme Court, "[t]housands of Puerto Ricans took time, risked their lives notwithstanding a potential infection with COVID-19 … awaited in lines under the sun, and paid for transportation or went on foot—more than once—to exercise their right to vote. Many even volunteered to work at the polling places to ensure the integrity of the proceedings, *and the* [*CEE*] *failed them miserably*." *Pierluisi-Urrutia v. Comisión Estatal de Elecciones*, 204 D.P.R. 841, 104 P.R. Offic. Trans. 18, 2020 WL 5044034 (Aug. 12, 2020). The high court further concluded that the Elections Commission ("Commission") "failed to comply with its duty to organize, direct and hold a full electoral process for the scheduled primaries" and "hope[d], in the name of democracy, that there be no more mistakes, inefficiency, errors, or delays" in the future. *Id.*, 104 P.R. Offic. Trans. 53, 2020 WL 5044034. "Any other result," the Supreme Court said, would be "blatantly unacceptable." *Id.*

**B.    Plaintiffs' Successful Lawsuit Guarantees Safe Voting For Themselves And Similarly Situated Seniors.**

Defendants' Answer also concedes that the increase in COVID-19 cases coupled with Puerto Rico's failure to implement safe voting measures made early-

and absentee-voting alternatives for senior citizens for the November 2020 general election imperative.  A307.  But when, as of August 20, the Commission had not yet announced protective measures for senior-citizen voters, Plaintiffs filed their *Complaint for Injunctive and Declaratory Relief* and *Motion for a TRO and Declaratory and Injunctive Relief* (collectively, the "<u>Complaint</u>").  The Complaint alleged that the Commission's absentee-voting policies would threaten the health or disenfranchise prospective voters older than 60, as exclusive in-person voting forced them to face untenable health risks, amounting to a deprivation of those voters' right to vote in violation of the Fourteenth Amendment under the *Anderson-Burdick* standard.  A1-35; A36-125.  Plaintiffs requested, among other things, that the District Court enjoin the Commission to implement policies allowing senior citizens like them to safely vote in the November 2020 general election, including by allowing early and mail-in voting for voters over the age of 60.  A26.

Taking place in what the District Court called a "fluid factual and legal landscape" in summer and early fall of 2020, Plaintiffs' case presented proof tailored to address the fast-developing COVID-19 pandemic.  A406.  Plaintiffs did not just present their own declarations to show the irreparable harm they stood to face absent relief, they also submitted affidavits from two experts.  First, they submitted a declaration from Dr. Arthur L. Reingold, Division Head of Epidemiology and Biostatics at the University of California, Berkeley, School of Medical Health.

A322. Dr. Reingold attested to the "epidemiologic aspects of the COVID-19 pandemic; population segments at greater risk of infection, including geriatric patients; and characteristics of polling stations as prime area for increased virus transmission." A322-323.

Plaintiffs also submitted a declaration from Mayra Socorro Ortiz Tapia, a Puerto Rico-based Certified Clinical Gerontologist who "describ[ed] [the] general outlook of [the] COVID-19 pandemic for people over 60 in Puerto Rico" as of August 2020. A323. As the District Court later noted, Plaintiffs' experts' "findings and conclusions [went] unrebutted": "Defendants submitted no counterstatements or materials of evidentiary value" against them. A323.

Once filed, the lawsuit was short-lived: it took just over a month for the District Court to issue final judgment in Plaintiffs' favor. But the path to judgment was complicated by Defendants' dilatory conduct in the face of a looming election. For example, on August 21, 2020, the District Court denied Plaintiffs' initial request for a TRO because Defendants had not yet appeared in the case. The court ordered Defendants to respond to the Complaint by August 31, 2020. A321.

But Defendants failed to respond by that court-ordered deadline. At that point, citing the urgency of the relief sought, Plaintiffs moved for entry of default judgment. A321. The District Court denied that that motion, but ordered Defendants to show cause by September 4, 2020, why the requested default relief should not be

granted. A321. Defendants waited until that deadline, September 4, to request a week-long extension to respond to the Court's order to show cause, which the Court granted. A321. Yet, mindful of imminent mail-in ballot application deadlines, Plaintiffs asked the District Court to reconsider its extension. A321. Otherwise, Plaintiffs explained, they would be left with fewer than three days to apply to use that service even if the Court granted immediate relief. District Court ECF No. 26. The District Court agreed, and shortened Defendants' extension, instead ordering them to respond to Plaintiffs' injunctive relief motion by September 8 "at noontime." A321. It was, finally, on that hard-fought deadline, that Defendants responded to the emergency-relief motion—more than a week after the District Court first ordered them to do so.

On September 10, 2020, Plaintiffs filed an Amended Motion for TRO and Preliminary Injunction. A129-272. Defendants filed their *Motion to Dismiss and Opposition to the Motion for Preliminary Injunction* on September 11, 2020. A273-305.

On September 11, 2020, the District Court held a preliminary-injunction hearing. That same day, it issued a bench order enjoining Defendants to allow voters of at least 60-years of age to vote early by mail and to extend by ten days the deadline for those voters to apply for mail-in ballots. Notice of Docketing, Doc. 00118188046, at 7. On September 14, the District Court memorialized its ruling in

a written order that granted Plaintiffs' requested preliminary injunctive relief nearly in total, ordering the Commission to allow voters over the age of 60 to vote by mail with an extended application deadline, and to engage in a media campaign to publicize the right to vote by mail and the extended deadline. A330-331.

Although the District Court denied Plaintiffs' request for a list identifying voters over 60 who were eligible for early and absentee voting, A331, that request was essentially mooted by the relief it did grant. Because the court had ordered the Commission to recognize senior citizens as eligible to vote early by mail-in ballot, extend the deadline for eligible voters to register for early voting, and launch a media orientation campaign to apprise seniors of their rights and the modified deadline, a list of eligible voters that private civic organizations could use to provide notice was unnecessary. A330-331.

After it entered a preliminary injunction, the District Court ordered the parties to show cause as to why that injunction, which was limited to the November 2020 election, should not be made permanent. A321. Once it considered the parties' subsequent briefing, the District Court converted the preliminary injunction to a permanent one. A336-339. Doing so, it explained that all arguments relating to Plaintiffs' sought relief were "fully briefed," and Defendants made "[n]o new arguments on the substance" of the claim at issue. A338. "Under these conditions,"

the District Court concluded, "plaintiff's request for permanent injunction must be granted." A338. Final judgment issued on September 23, 2020. A339.

### C. Plaintiffs' Fee Motion And The District Court's Fee Award

On November 2, 2020, Plaintiffs filed their *Motion for Attorneys' Fees and Costs* (the "Fee Motion"), requesting $67,680 in fees as a prevailing party and $2,932.03 in costs pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. A340-385. The parties fully briefed the Fee Motion by December 2, 2020. A386-400. After carefully considering both sides' arguments and detailed records submitted by Plaintiffs' counsel in support of the Fee Motion, the District Court granted it in the amount of $64,415 on December 26, 2023 (the "Fee Award"). A401-409. The small reduction related to fees incurred for work on a consent decree that Plaintiffs ultimately did not pursue. A408.

The District Court otherwise credited Plaintiffs' arguments for fees in full. Specifically, it found that Plaintiffs' case "was by no means 'simple,'" marked as it was, by the "context of a fluid factual and legal landscape" surrounding the COVID-19 pandemic and recent changes to Puerto Rico's voting laws. A406. Plaintiffs' staffing choices—which Defendants challenged as excessive—were reasonably made to address "specialized legal questions within a novel, rapidly evolving backdrop" in which "time was of the essence," particularly considering how the Commission had "failed [voters] miserably" in the primaries. A407. (internal

quotations and citations omitted). The District Court further held that Plaintiffs' Fee Motion was timely, and supporting time entries were "well organized and sufficiently detailed to permit meaningful review." A408. To the extent Plaintiffs billed for time spent working on "unsuccessful" motions—like Plaintiffs' opening request for a TRO—that "came as a direct result of defendants' failure to [] respond in a timely manner." *Id.* The District Court denied Plaintiffs' request for costs as untimely under local rules.

### D. Defendants' Rearguard-Action Effort To Invoke PROMESA

While the underlying litigation progressed, the Commonwealth reached significant milestones in its reorganization proceedings under the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") (the "Title III Proceedings"), which the Commonwealth entered to address its unmanageable debt.[1]

Back on May 3, 2017, the Commonwealth filed a *Petition* with the U.S. District Court for the District of Puerto Rico under Title III of PROMESA (the "Petition") seeking to reorganize its debts under the supervision of the Title III court and an appointed oversight board. Complaint, *In re Financial Oversight & Mgmt. for P.R.*, No. 17-BK-3283-LTS (D.P.R. May 3, 2017) (ECF No. 1). The Commonwealth's reorganization proposal was laid out in a series of plans, the

---

[1]    *In re Financial Oversight & Mgmt. Bd. for P.R.*, No. 17-BK-3283-LTS (D.P.R.).

operative version of which, the *Modified Eighth Amended Title III Joint Plan of Adjustment*, was filed on January 14, 2022 (the "Plan").  A541-863.  On January 18, 2022, the Title III court entered an *Order and Judgment* confirming the Plan (the "Confirmation Order"), A447-540, and the Plan went effective on March 15, 2022 (the "Effective Date").  Notice of Order Confirming Plan and Occurrence of Effective Date, *In re Financial Oversight & Mgmt. Bd. for P.R.*, No. 17-BK-3283-LTS (D.P.R. Oct. 21, 2022) (ECF No. 22663).

Among other things, the Plan and Confirmation Order contain a Discharge Injunction, which discharges, releases, and enjoins certain pre-Effective Date claims against the Commonwealth other than those filed as a claim in the Title III Proceedings (the "Discharge Injunction").  A733-736.  The Plan provides for an administrative claim bar date (the "Admin Claim Bar Date") of ninety days after the Effective Date (June 13, 2022), A574, which was later extended to January 23, 2023 for certain claimants.  *See* Order Extending Administrative Claim Bar Date for Certain Parties and Modifying Discharge Injunction, *In re Financial Oversight & Mgmt. Bd. for P.R.*, No. 17-BK-3283-LTS (D.P.R. Oct. 20, 2022) (ECF No. 22650).

On January 23, 2024, Defendants filed a *Motion for Reconsideration* of the Fee Award (the "Reconsideration Motion"), styled as a motion under Rule 59(e) of the Federal Rules of Civil Procedure and arguing only that the District Court erred in its lodestar calculation.  A410-425.  Plaintiffs filed their *Response and Opposition*

to the Reconsideration Motion, A426-438, and Defendants filed a *Reply in Opposition*, A868-879.

After briefing was complete on the Reconsideration Motion and pending the District Court's decision, on May 6, 2024, Defendants filed a *Notice of Injunction Pursuant to the Confirmation Order Issued by the Title III Court* (the "Notice"). A439-446. In the Notice, Defendants argued for the first time that the Discharge Injunction applied to the Fee Award. A439-446. The next day, the District Court entered a minute order explaining that it "intend[ed] to deny [Defendants'] motion for reconsideration" after "a thorough review of the record and applicable law," but nonetheless ordered Plaintiffs to respond to the Notice. *See* Doc. 00118188046, at 11. On June 3, 2024, Plaintiffs filed their *Response*, A880-894, and Defendants filed a *Reply* on June 18, A895-956. On July 31, 2024, the District Court entered a *Memorandum and Order* denying the Reconsideration Motion (the "Reconsideration Order"), and rejecting the Discharge Injunction arguments first raised in the self-styled Notice. A957-960.

Defendants noticed this appeal on August 23, 2024, A961-962, which was docketed on September 10, 2024. Doc. 00118188046. After the Court issued a notice of default and intent to dismiss, Defendants filed a docketing statement on September 25, 2024. Defendants tendered their *Brief* and *Appendix* on December 12, 2024, and were directed to file a conforming brief and appendix on December

23, 2024, which they did on December 27, 2024. A second notice of default and intent to dismiss was issued on January 14, 2025, for failure to submit paper copies of the brief and appendix, which Defendants cured.

## STANDARD FOR REVIEW

This Court reviews a denial of a motion for reconsideration for abuse of discretion. *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006). Reconsideration motions, in turn, are "an extraordinary remedy which should be used sparingly," and should be granted only when "newly discovered evidence (not previously available) has come to light or [] the rendering court committed a manifest error of law." *Id*. Thus, the standard of review here is whether the District Court abused its discretion in finding no manifest error in its initial decision, the Fee Award.

## SUMMARY OF ARGUMENT

Defendants levy a two-pronged attack on Plaintiffs' Fee Award. First, they argue that it should be barred in its entirety by the Discharge Injunction entered in the Title III Proceedings after years of silence on the matter and actively litigating the case as if the Discharge Injunction did not apply, because it does not. Second, they rehash garden-variety lodestar arguments for a reduction of the fees that the District Court considered and rejected twice. Both claims fail on several fronts, any of which is independently sufficient to dispose of this appeal in Plaintiffs' favor.

*First*, Defendants' attempt to seek refuge in the Discharge Injunction for the first time after years of litigating this case without any mention of it or suggestion that it might arguably apply is waived. Defendants treat the Discharge Injunction as a free pass. They said nothing about it during the nearly two years that lapsed between the Effective Date and entry of the Fee Award. They again said nothing in the Rule 59 Reconsideration Motion they filed to challenge the Fee Award, nor in their reply supporting that motion, for that matter. Only when the District Court made clear it would deny the Reconsideration Motion did they then argue that the Discharge Injunction barred the Fee Award's collection. But arguments not raised in an initial response to a fee petition are waived. Arguments not raised before entry of the order in question are waived. Arguments raised for the first time in briefing on a motion for reconsideration are waived. And arguments raised in only skeletal form in an attempt to preserve them are waived. At every step that Defendants could have thus waived their arguments on the Discharge Injunction, they found a way to do so.

*Second*, even if Defendants had timely raised the argument, the Discharge Injunction does not apply to the Fee Award. The Discharge Injunction only applies to claims that arose before the Effective Date of the Plan. But the District Court entered the Fee Award *after* the Effective Date and, given the unique nature of fee

awards as within the court's discretion, Plaintiffs had no claim until the entry of the Fee Award.

Moreover, PROMESA itself exempts from discharge in the Title III Proceedings claims arising from enforcement of federal police or regulatory laws, including laws to protect public health and safety, whether those claims are brought by the government or by private individuals. That exemption applies to Plaintiffs' claim for attorneys' fees under 42 U.S.C. §§ 1983 and 1988, a federal civil rights law enacted to protect public health and welfare and applied here to protect public health and federal voting rights, and the fee-shifting statute that vests enforcement power in private citizens.

And even if Plaintiffs' claim is subject to the Discharge Injunction and is not exempted by PROMESA, then Plaintiffs were known creditors entitled to direct notice of the Title III Proceedings, which they clearly did not receive. As a result, the Discharge Injunction cannot be applied against Plaintiffs' claim as a matter of due process.

*Finally*, Defendants' arguments to reduce the Fee Award—here, on appeal from a ruling on a Reconsideration Motion brought pursuant to Rule 59—also lose. The District Court carefully examined Plaintiffs' Fee Motion against the complex, fast-moving backdrop of the underlying litigation, and found them reasonable, deducting fees for certain work it found unsupported. Defendants provide no

meaningful criticism of the fees awarded, instead reasserting their general complaints of overstaffing and duplicative work that the District Court already considered and dismantled, and there is no reason to disturb its findings now.

## ARGUMENT

## I. DEFENDANTS WAIVED ARGUMENTS RELATED TO THE DISCHARGE INJUNCTION BY NOT RAISING THEM DESPITE MULTIPLE OPPORTUNITIES

Defendants' Discharge Injunction arguments were thrice-waived below, and as such are inappropriate for consideration on appeal. Defendants are in the truly unique posture of having waived the arguments at *every opportunity they had to do so*, both in connection with the underlying Fee Motion and in the Reconsideration Motion they brought and fully briefed. So, while Defendants' appeal is taken from the denial of the Reconsideration Motion, that motion and its subsequent briefing did not even mention, let alone fully develop, the Discharge Injunction arguments Defendants advance now. Those arguments were raised for the first time in a "Notice" filed *after* the Reconsideration Motion was fully briefed, and then only in threadbare fashion. Defendants had multiple opportunities to raise the arguments below and avoid waiver. They did not.

### A. Defendants Waived The Discharge Injunction Argument By Failing To Raise It Prior To The Fee Award.

Even assuming Defendants had to wait until the Plan went effective to provide notice of their purported belief that the Discharge Injunction might apply to any

future award of fees in this case (and they did not), they had nearly *two years* between the Effective Date on March 15, 2022, and when the District Court issued the Fee Award on December 26, 2023, to raise their Discharge Injunction arguments to the District Court.[2] That could have taken any number of forms, such as a motion to submit supplemental authority in support of their then-pending opposition to the Fee Motion, or even a "Notice" of the Discharge Injunction in the Title III Proceedings like the one they ultimately, belatedly filed. "Failure to raise the relevant issues at any time during the long history of this litigation," when the District Court could have considered the issue and afforded relief as appropriate, waives the argument in further proceedings. *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 33 (1st Cir. 2001) (argument not raised pre-trial, during trial, or post-trial except in "perfunctory and confusing manner" could not be raised for the first time in a reconsideration motion or on appeal, and if the late-raised argument "had any merit," it should have been raised "early and often"); *see also Bartlett v. Mutual Pharm. Co.*, 759 F. Supp. 2d 171, 195 (D.N.H. 2010) (finding waiver where defendant failed to take steps in the litigation to preserve an argument, including

---

[2]     In their briefing below, Appellants argued that the Discharge Injunction in the Confirmation Order was "similar to the automatic stay." A899. Yet Appellants never sought to invoke the automatic stay, which had been in place since 2017, and instead vigorously litigated the underlying Complaint, indicating that they, too, did not believe it applied.

seeking appropriate jury instruction, and then first raised it in a reconsideration motion).

### B. Defendants Further Waived The Discharge Injunction Argument By Failing To Raise It In Their Reconsideration Motion.

Having failed to raise their Discharge Injunction arguments at an appropriate time prior to entry of the Fee Award, Defendants then filed a Reconsideration Motion which also contained not a whisper of these arguments. A410-425. That Motion, which complains of the District Court's lodestar application and whether Plaintiffs succeeded in their request for injunctive relief, *see* A410-425, nowhere mentioned the Discharge Injunction or the Plan that went into effect nearly two years prior. Briefing was completed over two years after the Effective Date, including an extension for Defendants to file a reply brief that contained no mention of the Discharge Injunction or the Title III Proceedings. A868-879.

Of course, even if Defendants had included the Discharge Injunction arguments in their Reconsideration Motion, Rule 59 "does not provide a vehicle for a party to undo its own procedural failures." *Aybar v. Crispin-Reyes*, 118 F.3d 10, 16 (1st Cir. 1997) (citations omitted); *Empresas Stewart Cementerios v. Central Gen. de Trabajadores*, No. CV 22-01320, 2023 WL 6631954, at *3 (D.P.R. Oct. 12, 2023) (same). As such, "a party may not, on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir.

2003); *see also United States v. Rivera-Rodríguez*, 75 F.4th 1, 20 (1st Cir. 2023) (arguments that "could have been raised before the court issued its underlying judgment" with appropriate diligence "may not be raised for the first time on reconsideration").

Where, as here, Defendants could have raised the argument prior to the District Court's issuance of the Fee Award, the Reconsideration Motion could not have saved them even had they raised it then. But, having failed to raise these arguments in *both* their original and reconsideration briefing, Defendants waived them yet again. *See Kaplan v. First Hartford Corp.*, 716 F. Supp. 2d 11, 19 (D. Me. 2010) (litigant forfeited argument by failing to raise it sooner in the proceedings); *see also United States v. Crocco*, 15 F.4th 20, 25 (1st Cir. 2021) (arguments raised in supplemental brief filed after oral argument were waived); *United States v. Mayendía-Blanco*, 905 F.3d 26, 33 (1st Cir. 2018) (arguments first raised in supplemental brief were waived).

## C. Defendants Waived The Discharge Injunction Argument By Failing To Fully Develop It Below.

When Defendants finally raised some specter of the Discharge Injunction arguments in their Notice, after briefing on the Reconsideration Motion was complete, they waived them for the third time by offering only a bare-bones version of what would eventually become their chief argument on appeal. But "[j]udges are not mind-readers, so parties must spell out their issues clearly, highlighting the

relevant facts and analyzing on-point authority." *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011). And "[i]t should go without saying that [courts] deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument" as well as arguments "confusingly constructed and lacking in coherence." *Id.* (citations omitted).

Defendants' Notice mentioned the Commonwealth's May 3, 2017 Petition Date, the January 18, 2022 Confirmation Order, and the March 15, 2022 Effective Date but offered no explanation for why Defendants could or did not raise these issues at any time over the preceding years and instead continued litigating as if the Title III Proceedings had no bearing on the present action. A439-446. Substantively, Defendants argued in the Notice that the District Court "lacks jurisdiction to continue the proceedings from the moment the *injunction* at ¶ 59 came into effect." A445 (emphasis in original). But they cited no case law for that proposition, only the Confirmation Order and Notice of the Effective Date, A445, and made no showing as to why Plaintiffs' claims should be barred based on a notice not sent to them.

On appeal, Defendants now raise new and more fulsome arguments not thoroughly developed below. On top of failing to timely raise their Discharge Injunction arguments despite ample opportunity, when Defendants finally did raise them, they did so in a cursory, confusing fashion that did not provide Plaintiffs, or

the District Court, the opportunity to adequately address the issues presented.[3]  As the District Court was in no position to guess at what the arguments might be, *Rodríguez*, 659 F.3d at 175, it is no wonder Defendants' Discharge Injunction argument received short shrift in the Reconsideration Order.  *See United States v. Sevilla-Oyola*, 770 F.3d 1, 13 (1st Cir. 2014) ("Arguments raised in only a perfunctory and undeveloped manner are deemed waived on appeal.").

There is no reason to vary from the "raise-or-waive" doctrine here.  *See Sindi v. El-Moslimany*, 896 F.3d 1, 28 (1st Cir. 2018) (exception from "raise-or-waive" rule "must be applied sparingly and with great circumspection," and only where, among other things, such exception will not cause "undue prejudice.").  Defendants' delay was not harmless, and it would be prejudicial to Plaintiffs to allow the Discharge Injunction arguments now.  As Defendants note, the Admin Claim Bar Date, which Defendants contend applied to the Fee Award, passed on June 13, 2022 (or, as extended, January 18, 2023).  Defendants did not raise that contention until

---

[3]    The supplemental briefing the District Court requested did not alleviate this confusion.  Even if it had, providing Defendants the opportunity to further explain their belated, half-formed arguments did not "un-waive" those arguments.  *See Daniel R. L. v. Saul*, No. 1:20-CV-00258-DBH, 2021 WL 2801954, at *5 (D. Me. July 5, 2021), *report and recommendation adopted sub nom. Daniel R. L. v. Kijakazi*, No. 1:20-CV-258-DBH, 2021 WL 3115820 (D. Me. July 22, 2021) (after requesting supplemental briefing to address late-raised argument, "[i]t would be unfair to hold that, in seeking clarification on the confusing procedural posture of this case, I invited the commissioner to reverse course and assert that a waivable exhaustion issue he chose not to press at several junctures now bars judicial review").

*two years* after that date passed. A439-446. Even if Defendants were correct that the Fee Award is subject to the claims resolution process in the Title III Proceedings—and they are not—it would be manifestly unjust to enforce that process against claimants who were only provided notice thereof years after the time to file had passed. As this Court has noted, "a party has a duty 'to spell out its arguments squarely and distinctly … [rather than being] allowed to defeat the system by seeding the record with mysterious references … hoping to set the stage for an ambush should the ensuing ruling fail to suit.'" *McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d 13, 22 (1st Cir. 1991) (quoting *Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir. 1988)).

But even if this manifest prejudice to Plaintiffs were not present, a litigant's failure in its duty to the Court is itself sufficient to enforce a waiver. *See CMM Cable, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1526 (1st Cir. 1996) (quoting *McCoy*, 950 F.2d at 22) ("[C]oncerns about parties and courts being 'ambushed' is not the only reason for the raise-or-waive rule: In opposing motions, parties 'cannot expect a trial court to do [their] homework for [them].'"). Defendants' "somber record of inattention" forfeits its ability to raise their Discharge Injunction arguments now, and this Court "should not lightly relieve [Defendants] from the condign consequences of [their] failure." *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1195 (1st Cir. 1995).

## II. THE FEE AWARD IS UNAFFECTED BY THE DISCHARGE INJUNCTION ENTERED IN THE TITLE III PROCEEDINGS

### A. The Discharge Injunction Does Not Bar The Fee Award Because The Fee Award Did Not Arise Until After The Effective Date Of The Plan.

The Plan provides that "[u]pon the Effective Date, the Debtors and Reorganized Debtors shall be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the Effective Date." Plan § 92.2(a), A733. The Confirmation Order, in turn, provides that "all Entities who have held, hold, or in the future hold Claims or any other debt or liability that is discharged or released pursuant to section 92.2 of the Plan … are permanently enjoined, from and after the Effective Date, from" enforcing such claims. Confirmation Order ¶ 59, A513. These provisions, taken together, constitute the Discharge Injunction. Thus, by its terms, the Discharge Injunction applies only to claims that arose prior to the Effective Date.

Unlike Plaintiffs' underlying claim for nonmonetary relief to address Defendants' violation of their First and Fourteenth Amendment rights under 42 U.S.C. § 1983, which arose at the time those violations occurred,[4] Plaintiffs' claim

---

[4] While Plaintiffs' underlying claims arose at the time the of Defendants' constitutional violations in 2020 and thus post-dated the Commonwealth's Petition, they would not have been enjoined by the automatic stay had Defendants sought to invoke it or, ultimately, discharged by the Discharge Injunction, because they were claims for injunctive relief. *See* 11 U.S.C. § 362(a)(1) (staying any judicial

for payment of the attorneys' fees the District Court awarded could not have arisen, and therefore didn't arise, until the District Court entered its Fee Award on December 26, 2023, long after the March 15, 2022 Effective Date. It is thus a post-Effective Date claim not subject to the Title III Proceedings' claims resolution process. Section 1988 provides that "[i]n any action or proceeding to enforce a provision of section[] … 1983 … of this title … the court, *in its discretion*, may allow the prevailing party … a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988 (emphasis added).

As any award of fees under § 1988 is within a court's discretion, such awards are akin to an exercise of a court's "inherent power" to award fees as a sanction to police the conduct of litigants. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). Such inherent authority is indistinct from statutory schemes empowering courts to award fees, and the two exist in parallel. *See id.* at 50 ("There is, therefore, nothing in the other sanctioning mechanisms or prior cases interpreting them that

---

proceeding "that was or could have been commenced *before* the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title") (emphasis added); and *Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 36 (1st Cir. 2009) (quoting *In re Continental*, 125 F.3d 120, 133 (3d Cir.1997)) ("Under § 101(5)(B), a right to an equitable remedy, whether or not fixed, disputed, or reduced to judgment, is a 'claim' within the meaning of the Bankruptcy Code, and subject to bankruptcy proceedings, if a 'monetary payment is an alternative for the equitable remedy.'").

warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct.").

To be sure, the law is clear that a prevailing civil-rights plaintiff "*should ordinarily recover*" reasonable attorney's fees barring "special circumstances" making an award unjust. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (emphasis added) (citation omitted). And a district court's "discretion" once it identifies a prevailing plaintiff for the statute's purposes "is narrow." *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 68 (1980). But the Supreme Court has very recently explained that § 1988 "*permits* courts to award attorney's fees," in their discretion, "to a 'prevailing party.'" *Lackey v. Stinnie*, No. 23-621, 604 U.S. ___ slip op. at 13 (Feb. 25, 2025), (emphasis added). "[T]he change in relationship and [] permanence" consistent with determining whether a plaintiff "prevails" "must result from a judicial order." *Id.*

If any doubt remained, the legislative history reinforces that fees awarded under § 1988 are an exercise of judicial power, since "Congress has instructed the courts to use the broadest and most effective remedies available to achieve the goals of our civil rights laws." S. Rep. No. 94-1011, 3, *reprinted at* 1976 U.S.C.C.A.N. 5908, 5910-5911. Consistently, § 1988 codified a trend of Federal courts, "following Congressional recognition in the newer statutes of the 'private attorney general' concept, [] exercising their traditional equity powers to award attorneys'

fees." *Id.* at 5911. As a result, a claim for payment of a § 1988 fee award does not arise unless and until a court determines a plaintiff is a "prevailing party," concludes a fee is "reasonable," finds that special circumstances do not render an award "unjust," and exercises its authority to order fees. *See De Jesús Nazario v. Morris Rodríguez*, 554 F.3d 196, 200 (1st Cir. 2009); *Burke v. Guiney*, 700 F.2d 767, 772 (1st Cir. 1983).

This is akin to other potential rights that, though prescribed by statute, do not exist until ordered by a court. For instance, in *In re Cano,* 410 B.R. 506, 528 (Bankr. S.D. Tex. 2009), a putative class filed suit against a mortgage lender alleging violations of certain rights afforded to debtors under chapter 13 of the bankruptcy code, including the right to modify the rights of a secured claimholder and the right to cure defaults on certain claims. The court found that those rights do not accrue until ordered by a court. "Rights only arise from the provisions after the court has issued an order confirming a plan that incorporates those rights. Ultimately, the court order gives rise to the rights." *Id.*; *see also In re Rojas*, No. 07-70058, 2009 WL 2496807, at *3 (Bankr. S.D. Tex. Aug. 12, 2009) (same). Likewise, here, Plaintiffs' claim to payment of attorneys' fees did not arise until the District Court entered the Fee Award requiring that payment, which in turn was not entered until after the Effective Date of the Commonwealth's Plan.

The cases cited by Defendants are unavailing, as they all concerned direct claims for monetary damages arising from underlying litigation, which were not the underlying relief Plaintiffs sought here; none of the cited cases discuss the unique circumstance of a fee award subject to the exercise of a court's power. *See* App. Br. 25-29. Those cases, *Vélez-Molina v. Rivera Schatz*, No. CV 20-1565 (MEL), 2023 WL 6536235, at *1 (D.P.R. Sept. 29, 2023), *Villalobos-Santana v. Puerto Rico Police Bureau*, No. CV 21-1312 (ADC), 2024 WL 3152641, at *3 (D.P.R. June 5, 2024), *Osuji v. Departamento de la Familia*, No. CV 20-1545 (RAM), 2023 WL 2753683, at *1 (D.P.R. Apr. 3, 2023), *opinion vacated on reconsideration sub nom. Aaduka Osuji v. Departamento De La Familia*, No. CV 20-1545 (RAM), 2023 WL 6216352 (D.P.R. Sept. 25, 2023), *Ortiz-Resto v. Rios-Matienzo*, No. 21-1232 (1st Cir.), and *In re Financial Oversight & Mgmt. Bd. for Puerto Rico*, 650 B.R. 286, 289 (D.P.R. 2022), all concern suits that were filed pre- or post-petition, but remained pending as of the Effective Date. None involve a circumstance where the underlying litigation concluded *prior to* the Effective Date, and where the claim at issue was for payment of a fee award that was only ordered *after* the Effective Date. Thus, none of these cases respond to the argument *supra*.

**B. The Discharge Injunction Does Not Bar The Fee Award Because The Fee Claim Is A Non-Dischargeable Claim Under PROMESA.**

Even if Plaintiffs' claim for attorneys' fees did arise prior to the Effective Date of the Plan, PROMESA itself exempts the claim from discharge. Section 2164 of PROMESA provides:

> This chapter may not be construed to permit the discharge of obligations arising under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial laws implementing such Federal legal provisions. This includes compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties.[5]

48 U.S.C. § 2164.

Though the scope of § 2164 is not well-explored,[6] the First Circuit's discussion of this provision indicates that it applies here. In *Municipality of San*

---

[5] Notably, unlike the Bankruptcy Code's police-power exception to the automatic stay, § 2164's exception to the PROMESA discharge is *not* limited to obligations enforced by "governmental units," and thus applies with equal force to federal police or regulatory obligations enforced by private claimants, like Plaintiffs here. *Compare id. with* 11 U.S.C. § 362(b)(4) (excepting from the automatic stay "an action or proceeding by a *governmental unit* … to enforce such governmental unit's or organization's police and regulatory power") (emphasis added).

[6] The Title III court has previously found § 2164 inapplicable in two cases, both inapposite here, as they concerned claims under non-Federal law. *See In re Financial Oversight & Mgmt. Bd. for P.R.*, 578 F. Supp. 3d 267, 289 (D.P.R. 2021), *aff'd*, 54 F.4th 42 (1st Cir. 2022) (concerning Puerto Rico common law fraud claims); *and In re Financial Oversight & Mgmt. Bd. for P.R.*, 650 B.R. 296, 304 (D.P.R. 2022) (concerning contractors' claims for payment under a Commonwealth regulation).

*Juan v. Puerto Rico*, 919 F.3d 565, 568-569 (1st Cir. 2019), a group of Puerto Rico hospitals invoked § 2164 as an exception to the automatic stay, arguing that the Commonwealth should continue to pay the hospitals certain reimbursements that the Commonwealth owed under Medicaid, in accordance with an injunction that had been issued in prior litigation over the issue. The Court found that § 2164 does not apply to the automatic stay—only to a discharge—but did state that § 2164 "directly references the Commonwealth's 'obligations arising under Federal … laws,' of which the Medicaid Act is certainly one." *Id.* at 577. The Court further indicated that § 2164 would operate to bar a *discharge* of the Medicaid obligations. *See id.* at 578 ("A discharge of that continuing obligation, by contrast, would bring an end to it altogether.").

Plaintiffs' claim for fees arose under sections 1983 and 1988 of Title 42 of the U.S. Code, which are federal police or regulatory laws that, like the Medicaid Act, relate to public health and safety. Indeed, Title 42 of the U.S. Code, under which both these sections and the Medicaid Act fall, is titled "The Public Health and Welfare." And Chapter 21, where these statutes are found, opens with a "Statement of Equal Rights" declaring that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory … to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings *for the security of persons and property* … ." 42 U.S.C. § 1981(a) (emphasis added). That

focus on the security of persons and property extends to Section 1983 which was originally enacted via the Civil Rights Act of 1871 and similarly reflects a "unifying theme [that] … no person shall be deprived of life, liberty, or property without due process of law or be denied the equal protection of the laws." *Wilson v. Garcia*, 471 U.S. 261, 277 (1985).

Within this framework, the Congressional purpose of fee-shifting under § 1988 is to allow private litigants to serve as "private attorney[s] general" in the enforcement of the various civil rights acts listed therein, including § 1983, and in so doing, "vindicating a policy that Congress considered of the highest priority." *Fox v. Vice*, 563 U.S. 826, 833 (2011); S. Rep. No. 94-1011, 3, *reprinted at* 1976 U.S.C.C.A.N. 5908, 5910. In doing so, these litigants "vindicat[e] a policy that Congress considered of the highest priority": achieving enforcement of the civil rights laws. *Fox*, 563 U.S. at 833.

Section 1983, for its part, originated as an attempt to address "the campaign of violence and deception in the South, fomented by the Ku Klux Klan, which [] den[ied] decent citizens their civil and political rights." *Wilson*, 471 U.S. at 276. It directly dealt with that "alarming insecurity of life, liberty, and property," "[b]y providing a remedy for the violation of constitutional rights … to restore peace and justice … through the subtle power of civil enforcement." *Id.* at 276-277. But it achieved much more. "[E]nacted to protect citizens against unconstitutional state

action," *Ortiz v. Hernandez Colon*, 511 F.2d 1080, 1082 (1st Cir. 1975), it "enforce[s] … the Fourteenth Amendment against those who … represent [a state or territory] it in some capacity, whether they act [within] their authority or misuse it," *Hafer v. Melo*, 502 U.S. 21, 21-22 (1991). And it has since been used to address various matters of public health or safety—including here, where the District Court found that the Commonwealth's refusal to allow vulnerable seniors to vote by mail at the peak of a public-health crisis forced upon Plaintiffs "the untenable choice between exercising their right to vote … and placing themselves at risk of contracting a potentially terminal disease." A320. The Fee Award, in turn, is an "obligation[] to pay [an] associated administrative, civil, or other penalt[y]" that is exempt from discharge under PROMESA. 48 U.S.C. § 2164.

As such, both sections 1983 and 1988 of Title 42 fall within a plain reading of PROMESA's discharge exemption, and the Discharge Injunction therefore does not operate to bar the Fee Award.

### C. Defendants Were Not Given Direct Notice Of The Title III Proceedings.

#### 1. As Known Creditors, Plaintiffs Were Entitled to Direct Notice of the Title III Proceedings.

If Defendants are correct that Plaintiffs' claim for attorneys' fees arose prior to the Effective Date, then Plaintiffs were known creditors entitled to actual notice of the Plan and Discharge Injunction, which Defendants did not provide.

The Federal Rules of Bankruptcy Procedure are incorporated into PROMESA by reference. 48 U.S.C. § 2170. Those Rules require a debtor to mail key case filings to creditors, including a notice disclosing any injunction in a proposed plan of reorganization and entry of orders confirming a plan with an injunction, like the plan's Discharge Injunction. *See* Fed. R. Bankr. P. 2002(b)(2), (c)(3), (f)(1)(H); *In re Arch Wireless, Inc.*, 534 F.3d 76, 82 (1st Cir. 2008) (citing Fed. R. Bankr. P. 2002(a)(7), 2002(f), 3017(d)). Indeed, the Commonwealth served those key case filings on an extensive list of parties during its Title III Proceedings. *See, e.g.*, Certificate of Service at 4, *In re Financial Oversight & Mgmt. for P.R.*, No. 17-BK-3283-LTS (D.P.R. Jan. 27, 2022) (ECF No. 19928) (certifying service of Commonwealth Plan, among other filings, on Master Service List). Because Defendants failed to provide notice before the Discharge Injunction's entry—or, indeed, at any time during years of litigation with Plaintiffs over the attorneys' fees claim until more than two years *after* entry of the Discharge Injunction—consistent with due process, that Injunction cannot bar Plaintiffs' Fee Award.

Defendants' arguments otherwise misunderstand the Bankruptcy Rules. "[B]ankruptcy law distinguishes between 'known creditors,' … entitled to receive direct notice of each stage in the reorganization proceedings, and 'unknown creditors,' for whom publication notice is sufficient." *Arch Wireless*, 534 F.3d at 80-81 (internal citations omitted). An unknown creditor's "interests are either

conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Id*. at 80.

By contrast, a known creditor "is one whose claims and identity are actually known or 'reasonably ascertainable' by the debtor." *Arch Wireless*, 534 F.3d at 80-81 (quoting *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490 (1988). A "creditor[s] is 'reasonably ascertainable' if [its] claim[s] can be discovered through 'reasonably diligent efforts,'" "includ[ing] 'a careful search of the debtor's own records.'" *Id.* (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983) and *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998)). Thus, "'the debtor must have in his possession … some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable.'" *Arch Wireless*, 534 F.3d at 81 (quoting *Crystal Oil*, 158 F.3d at 297)

If, as Defendants contend, Plaintiffs' claim arose as of the filing of the Complaint, or on November 2, 2020, with the filing of the Fee Motion, App. Br. 24, then there can be no doubt that Plaintiffs were "reasonably ascertainable" creditors before the Plan's confirmation more than a year later in January 2022, and were thus known creditors entitled to direct notice. Defendants' argument concedes that Plaintiffs' were known creditors, as does their active efforts throughout this litigation. Defendants clearly participated in the underlying litigation from the start,

and actively litigated both the merits of the substantive relief requested and the Fee Motion, well before the Confirmation Order. Plaintiffs' identities were therefore well known to Defendants. Defendants' own argument is that Plaintiffs' claim arose as early as the filing of the underlying case, leaving no doubt that Defendants regarded, or should have regarded Plaintiffs as known creditors at that point. As known creditors, due process entitled Plaintiffs to direct notice of the Admin Claim Bar Date and of other proceedings potentially relevant to their claims. *See New York v. New York, N.H. & H. R.R. Co.*, 344 U.S. 293, 297 (1953).

Defendants ignore this distinction entirely, instead stating that the "general public" was provided "adequate notice" by means of various publications of the pendency of the Title III Proceedings. App. Br. 30-31. In effect, they concede that Plaintiffs received no direct notice or any filing relevant to the Title III Proceedings that they claim bars their claim to attorneys' fees. But "general awareness of a pending Chapter 11 reorganization proceeding" cannot "satisfy the requirements of due process and render the discharge injunction applicable to the [known] creditor's claims." *Arch Wireless*, 534 F.3d at 87. And where notice is inadequate, a "discharge provision [is] ineffective against an unnotified creditor" as a matter of due process. *Id.* at 83-84.

*Arch Wireless* points the way. In *Arch Wireless*, a bankrupt debtor had confirmed a plan with a discharge injunction and sought to enforce that injunction

against a creditor that continued to pursue the debtor in state court on pre-confirmation claims. 534 F.3d at 79. The creditor argued that, because it was not provided notice as required by the Bankruptcy Rules, the discharge injunction did not apply to its claims. *Id*. It was assumed that the creditor was "generally aware" of the bankruptcy case from media reports, but there was "no evidence that [the creditor] had any actual knowledge of the bar date, the confirmation hearing, or the contents of the confirmation plan." *Id.* at 82. "[The debtor] did not provide and [the creditor] did not receive any of these notices." *Id*. But "general awareness" was "insufficient to satisfy the requirements of due process and render the discharge injunction applicable to the creditor's claims." *Id.* at 87.

Just as in *Arch Wireless*, it is undisputed that Plaintiffs did not receive the requisite notices. Instead, Defendants hinge their notice argument on media publication of the Title III Proceedings, and a vague reservation of rights that merely mentioned the Title III Proceedings without reference to any specific development. This "notice" is not enough. Indeed, it is firmly established law that "[n]otice by publication is a poor and sometimes a hopeless substitute for actual service of notice." *City of New York*, 344 U.S. at 296. And "even creditors who have knowledge of a reorganization have a right to assume that … 'reasonable notice' will be given them" before they lose their claims. *Id.* at 297. As a matter of due

process, Plaintiffs' claim to $64,415 in attorneys' fees under the civil-rights laws cannot be barred by the Discharge Injunction.

Defendants' failure to provide notice also reinforces the notion that they waived their Discharge Injunction arguments through delay. Defendants first raised those arguments long after the time to file a claim in the Title III Proceedings had passed. Had those arguments been timely brought, the parties could have sought clarification on whether the Discharge Injunction applied under these unique circumstances *before* Plaintiffs were foreclosed from the claims resolution process. Instead, Defendants waited until it was too late. Even if that delay was unintentional, Defendants' conduct at least bears the hallmarks of gamesmanship and is precisely the type of "ambush" that waiver doctrine is intended to prevent. *See McCoy*, 950 F.2d at 22 (1st Cir. 1991) (quoting *Paterson-Leitch*, 840 F.2d at 990) ("[A] party has a duty 'to spell out its arguments squarely and distinctly … [rather than being] allowed to defeat the system by seeding the record with mysterious references … hoping to set the stage for an ambush should the ensuing ruling fail to suit.'"). Just as Defendants' inaction threatened Plaintiffs' voting rights in the underlying suit, Defendants again threaten to deprive Plaintiffs of their due process rights through their dilatory litigation conduct.

## 2.	Publication Notice is Insufficient as to Known Creditors

Defendants' reliance on *Bernier* for the proposition that publication notice is sufficient as to any and all creditors is unavailing.  *See* App. Br. 32 (citing *In re Bernier*, No. 17-03544 (ESL), 2024 WL 1608580, at *3 (Bankr. D.P.R. Apr. 12, 2024)).  Neither *Bernier* nor the order of the Title III court *Bernier* cites discuss the known/unknown creditor distinction.  *See Bernier*, 2024 WL 1608580, *1 (citing Confirmation Order, Bankr. Case No. 17-3283, dkt. 19813, ¶¶ 56, 59).  These rulings instead discuss only the language of Bankruptcy Code § 944(c), which provides an exception to discharge for creditors who "before confirmation of the plan, had neither notice nor actual knowledge of the case."  11 U.S.C. § 944(c).  This is in direct contrast to courts that have, in discussion of § 944(c), observed and applied the known/unknown creditor distinction.  *See, e.g.*, *Monson v. City of Detroit*, No. 18-10638, 2019 WL 1057306, at *9 (E.D. Mich. Mar. 6, 2019) (citing *Arch Wireless*, 534 F.3d at 81-82).  While § 944(c) does provide *an* exception to discharge, it is not stated as a *limit* on what claims may be excepted from discharge.  Put simply, a creditor who had neither notice nor actual knowledge may be exempted under § 944(c), but exemptions are not *limited* to creditors who had neither notice nor actual knowledge.  Moreover, § 944(c) is not the sole source of authority on the notice requirements for a debtor under PROMESA or the consequences arising therefrom.

As noted in *Arch Wireless*, "[t]he Bankruptcy Rules specify that known creditors must receive: (1) notice of deadlines for filing proofs of claims (bar date), Fed. R. Bankr.2002(a)(7); (2) a copy of the reorganization plan, Fed. R. Bankr.3017(d); (3) notice of the confirmation hearing, Fed. R. Bankr. 3017(d); and (5) the confirmation order, Fed. R. Bankr.2002(f)." 534 F.3d at 82. The notice provisions of the Bankruptcy Rules "plac[e] the burden on the debtor to list its known creditors and personally notify them of specific key dates in the proceedings." *Id.* at 84. PROMESA incorporates the Bankruptcy Rules in their entirety. 48 U.S.C. § 2170. *Arch Wireless* further observes a "relationship between statutory provisions that promise notice of a certain kind and constitutional due process." 534 F.3d at 84. The notice requirement thus "shapes the contours of that constitutional due process analysis because it informs the reasonable expectations of creditors." *Id.* at 84-85. Under the Bankruptcy Rules, Plaintiffs, as known creditors, were entitled to direct notice of certain key filings. As they undisputedly did not receive such notice, the Fee Award is excepted from the Discharge Injunction as a matter of due process.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ENTERING AND DECLINING TO RECONSIDER THE FEE AWARD

Defendants' arguments as to the calculation of the Fee Award were all carefully considered and rejected by the District Court *twice* and do not warrant a different outcome here. This Court reviews both the denial of the Reconsideration

Motion and the underlying Fee Award for manifest abuse of discretion. *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 292 (1st Cir. 2001); *see also City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 36 (1st Cir. 2022). "In appeals involving the Fees Act, 42 U.S.C. § 1988, a reviewing court customarily defers to the trial judge, whose intimate knowledge of the nuances of the underlying case uniquely positions him to construct a condign award." *Gay Officers Action League*, 247 F.3d at 292. The Court "will set aside a fee award only if it clearly appears that the trial court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them." *Id.* at 292-293.

The District Court did not ignore any such factors and made no such mistakes.[7]  It appropriately applied the "lodestar method" to calculate fees, "multiplying the total number of hours reasonably spent by a reasonable hourly rate," and excised some fees it considered "[d]uplicative, excessive, unproductive, or otherwise unnecessary hours." A404-405 (citing *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984)). Ultimately, however, the Court took "into

---

[7]    Defendants repeatedly misstate the amount of fees the District Court awarded. While they state the correct amount of $64,415 twice in their brief, App. Br. 9, 17, more often they incorrectly state that the Court awarded $65,415 in attorneys' fees, including in their preliminary statement, statement of issues presented, summary of argument, in the header of the argument section on fees, and in the conclusion, App. Br. 13-15, 20, 32, 42.

consideration counsels' years of experience; the quality of the briefings; the prevailing market rate; and the degree of success of [Plaintiffs'] claims" to find the proposed fees were "reasonable and in line with [] fees sought" in the District of Puerto Rico.  A405.

Appealing the Reconsideration Order, Defendants still argue that the award should be reduced for (1) fees for "unsuccessful claims," (2) overstaffing and duplicative tasks, and (3) an excessive rate charged by one of Plaintiffs' attorneys. App. Br. 35-41.  But the District Court committed no abuse of discretion in granting the Fee Award—let alone declining to reconsider it.

### A.     Plaintiffs Achieved Broad Success In The Underlying Litigation, And The District Court Made Adjustments As It Deemed Appropriate

Defendants' refrain that the Fee Award should be reduced for so-called "unsuccessful claims," App. Br. 38, is a red herring.  Plaintiffs sued to ensure that they and other similarly situated voters aged over 60 could vote early or by mail-in ballot during the 2020 general election, which is exactly what the District Court ordered.  A330-331.  That the Court's relief took the most expansive form Plaintiffs requested—in effect, mooting lesser forms of requested relief—only highlights Plaintiffs' success.  It hardly means that Plaintiffs were "unsuccessful" on any claim. As such, the District Court correctly credited Plaintiffs' counsel's work and their

"degree of success," deducting time only for a task it found was unlikely to be productive. A408.

To be sure, the District Court denied Plaintiffs' initial TRO request, but the Court concluded that most fees expended related to it or other "unsuccessful" motions were "a *direct result* of defendants' failure to initially respond [to the TRO request] in a timely manner." A408 (emphasis added). Put simply, Defendants had to be forced into court. The District Court was hesitant to enter the TRO without Defendants' response and issued multiple orders affording Defendants opportunity to appear and state their position. A321. But Defendants repeatedly failed to do so. A321. So, far from denying the TRO request on its merits, the District Court just deferred its consideration, ordered Plaintiffs to quickly serve process on Defendants, and noted that Defendants' failure to respond without just cause by a date certain could "result in granting of the injunctive relief requested." Order, District Court ECF No. 5.

By the time Defendants engaged with the issues presented to the District Court, the TRO request had been obviated, and was subsumed into litigation of the preliminary injunction, which the District Court granted and later converted into final judgment. A330-331. Since the lack of "success" on the TRO request was no fault of Plaintiffs, resulted from Defendants' failure to timely respond, and just dovetailed into litigation over the preliminary injunction the District Court

ultimately entered, the District Court was well within its discretion to approve fees incurred for that work.  A408.

Defendants' separate request for a deduction of fees for work on an eventually denied *Motion for Entry of Default Judgment* again elides their lackadaisical litigation conduct.  App. Br. 38.  Plaintiffs only moved for default judgment when Defendants failed to respond to their motions for emergency relief by a court-ordered deadline.  *See* Doc. 00118188046, at 5.  Indeed, Plaintiffs' decision to seek default judgment was consistent with both the urgency of the looming election and the Court's instruction that injunctive relief could be granted if Defendants failed to meet the deadline without cause.  Doc. 00118188046, at 5.  Denying default judgment was surely within the District Court's discretion, but so was the decision to award fees incurred because of Defendants' missed deadlines, which left Plaintiffs no choice but to chase them into court.

And so on.  Defendants ask this Court to reduce fees incurred on a purportedly "unsuccessful" *Emergency Motion for Reconsideration* that Plaintiffs filed asking the District Court to rescind an extension Defendants secured to respond to the preliminary injunction.  App. Br. 38-39.  They omit that Plaintiffs partly succeeded: the District Court did, in fact, shorten the extension it had already granted by three days.  A321.  They also elide that Plaintiffs only asked the District Court to reconsider the extension because, at the time, Puerto Rico's absentee-voting

registration deadline was less than a week away, Defendants' continued failure to respond had already shortened the runway on possible relief, and time was of the utmost essence. District Court ECF No. 26. So yet again, these fees "came as a direct result of defendants' failure to initially respond in a timely manner." A408. And Defendants' corollary argument that that fees for work on this motion should be disallowed because of "Plaintiffs-Appellees' failure to support their request," App. Br. 39, ignores that the District Court found Plaintiffs' time entries to be "well organized and sufficiently detailed to permit meaningful review." A408.

Finally, Defendants argue that Plaintiffs' attorneys' fees should be reduced because the Complaint itemized the relief Plaintiffs sought, and "Plaintiffs-Appellees were unsuccessful in four (4) or the seven (7) requests for relief." App. Br. 39-40. Specifically, Defendants call out that a "request for the lists of senior citizens eligible was dismissed." App. Br. 40. This argument misses the point that all relief sought served the same overarching goal of ensuring access to early and mail-in voting for senior citizens. Had the District Court taken some measure short of enjoining Defendants to allow all senior citizens to vote by mail, an extension of the application deadline for mail-in voting, and a fulsome media orientation campaign, a list of voters over 60 could have been helpful to allow civic organizations to contact and educate voters. But the need for such a list was obviated by the Court's expansive order. A330-331. All the work done by Plaintiffs' counsel

to secure the preliminary and permanent injunction was the same work done in furtherance of the request for a voter list, as the latter was a subset of the former. No deduction is warranted.

**B.** **The District Court Appropriately Considered The Staffing Needed To Litigate Novel Issues During The Rapidly-Evolving COVID-19 Pandemic.**

With respect to the alleged overstaffing and duplicative tasks, the District Court was, as usual, "uniquely positioned to weigh the parties' staffing needs, assess the reasonableness of their handling of the case, and evaluate the quality and relevance of the services rendered," *Gay Officers Action League*, 247 F.3d at 298, and did so, A404-408. "[T]he mere fact that more than one lawyer toils on the same general task does not necessarily constitute excessive staffing," because, "[g]iven the complexity of modern litigation, the deployment of multiple attorneys is sometimes an eminently reasonable tactic." *Gay Officers Action League*, 247 F.3d at 297. Time spent by more than one attorney on the same task is not "per se duplicative." *Rodríguez-Hernández v. Miranda-Vélez*, 132 F.3d 848, 860 (1st Cir. 1998).

The complexity of the underlying case cannot be minimized to, as Defendants put it, "a single claim case that was resolved on the papers at the pleadings stage." App. Br. 36. The District Court accurately explained that Plaintiffs' case was a hard one, brought to vindicate fundamental voting rights just months before the 2020

election, against a backdrop of ever-shifting electoral regulations, and among the emergent circumstances of the COVID-19 pandemic. A406-407. To meet that daunting task, Plaintiffs worked with experts to proffer evidence that addressed the "unusual and substantial" "burdens" that this Court had noted voters everywhere were being asked to face as they headed to the polls in 2020. *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020); *see also id.* ("Taking an unusual and in fact unnecessary chance with your life is a heavy burden to bear simply to vote."). "Thus, not only did the case involve specialized legal questions within a novel, rapidly evolving backdrop, but time was of the essence[.]" A407. The District Court found that this set of circumstances "satisfactorily explain[ed] not only plaintiffs' staffing needs but also how pre-litigation and litigation work was distributed among the different attorneys that participated in the case." A407.

Defendants' reductive description of the underlying case does nothing to support their objection to Plaintiffs' staffing on the case, which amounts to a formalistic head-counting exercise.[8] As the District Court found, the complex, novel, and fast-moving nature of this case required the staffing used by Plaintiffs' counsel, because "[e]ffective preparation and presentation of a case often involves

---

[8] As only one example, Defendants object to Plaintiffs' counsel having held 26 meetings over the course of the litigation, without any explanation of why those meetings were unnecessary or excessive. *See* App. Br. 37.

the kind of collaboration 'that occurs when several attorneys are working on a single issue.'" A406 (citing *Gay Officers Action League*, 247 F.3d at 297).

### C. Attorney Mayte Bayolo's Fees Were Appropriate.

Lastly, Defendants single out a specific attorney's fees—Ms. Mayte Bayolo, of the ACLU of Puerto Rico—and argue that they ought to be reduced from $250 an hour to $125 an hour. But Defendants waived that argument by failing to present it when initially litigating the Fee Award. *Lubricantes Venoco, Int'l, C.A. v. M/V NEVERIS*, 60 F. App'x 835, 839 (1st Cir. 2003) (arguments "not timely made during the pendency of a case, and raised for the first time thereafter in a motion for reconsideration, are deemed waived on appeal."). It is meritless in any event.

Defendants did not object to Ms. Bayolo's rate in their Response to the Fee Motion, and the District Court found the rates reasonable. A405 ("[D]efendants do not object to plaintiffs' attorney's billing rates, and the court independently finds them reasonable."). They first challenged Ms. Bayolo's rate in their Reconsideration Motion. A419-420. That alone is enough to deny the request. *See Aybar*, 118 F.3d at 16; *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 190 (1st Cir. 2004) ("Rule 59(e) motions are aimed at re consideration, not initial consideration." (quoting *F.D.I.C. v. World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir. 1992)).

Still, Defendants renew their late-arriving attacks on Ms. Bayolo's litigation credentials, claiming that at the time of the underlying case, she was "not admitted

to the United States District Court for the District of Puerto Rico" or titled as "a litigation attorney within the ACLU, but a legislative attorney … ." App. Br. 40-41. These are semantics that in no way speak to Ms. Bayolo's experience. The District Court, best placed to review the parties' dispute on fees, had access to Ms. Barolo's *curriculum vitae*. *See* A383-385 (Bayolo CV). That document shows that at the time of the lawsuit, Ms. Bayolo had been admitted to practice in Puerto Rico for over eight years. *Id.* In practice, she spent five and a half years as a public defender in Puerto Rico, and a year in the same role in Louisiana. *Id.* Consistent with that post's usual demands, she had litigated dozens of cases, including through appeals. *Id.*; *cf. also Luis v. United States*, 578 U.S. 5, 21-22 (2016) (describing public defenders as "overworked" and noting they generally "serve numerous clients and have only limited resources"). It was therefore well within the District Court's discretion to conclude that Ms. Bayolo's "skill, experience and reputation" justified the rate of $250 charged for her services. *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1190 (1st Cir. 1996).

## CONCLUSION

Plaintiffs respectfully request that the Court affirm the rulings of the District Court.

Respectfully submitted,

                                        /s/ Ryanne E. Perio
FERMÍN L. ARRAIZA-NAVAS                  GEORGE W. SHUSTER, JR.
AMERICAN CIVIL LIBERTIES                 RYANNE E. PERIO
    UNION OF PUERTO RICO                 THOMAS B. DAVIS
Union Plaza, Suite 1105                  WILMER CUTLER PICKERING
416 Avenida Ponce de León                    HALE AND DORR LLP
San Juan, PR  00918                      7 World Trade Center
(787) 966-313                            250 Greenwich Street
                                         New York, NY 10007
ADRIEL I. CEPEDA DERIEUX                 (212) 230-8800
AMERICAN CIVIL LIBERTIES                 Ryanne.Perio@wilmerhale.com
    UNION FOUNDATION
915 15th St. NW                          *Counsel for Plaintiffs-Appellees*
Washington, DC  20005
(787) 565-0189

VICTORIA OCHOA
THERESA J. LEE
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 17th Floor
New York, NY  10004
(212) 549-2500

February 26, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,348 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Ryanne E. Perio
RYANNE E. PERIO
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Ryanne.Perio@wilmerhale.com

February 26, 2025

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Plaintiffs-Appellees Belia Arlene Ocasio and Efraín Colon-Damiani with the Clerk of the United States Court of Appeals for the First Circuit via the CM/ECF system this 26th day of February, 2025 which will send notification of such filing to all counsel who have filed appearances in this case.

/s/ Ryanne E. Perio
RYANNE E. PERIO
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Ryanne.Perio@wilmerhale.com

February 26, 2025